UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CRIMINAL ACTION NO. 3:04CR-83-R

UNITED STATES OF AMERICA

v.

REGINALD CHANTEZ RICE, et al.

## MEMORANDUM OPINION

This matter is before the Court on a Joint Motion to Suppress Wiretap Evidence (Dkt. # 217) filed by all twelve Defendants to this criminal action (Defendants Rice, J. Jimenez-Huerta, G. Jimenez-Huerta, Evans, Smith, D. Crenshaw, J. Crenshaw, Middleton, Walker, Sheppard, Moore, and Gray).  The United States responded (Dkt. # 232) and a hearing was held in open court on June 20, 2005.  After the hearing, the Defendants jointly filed a brief (Dkt. # 281) to which the United States  responded (Dkt. # 289) and the Defendants replied (Dkt. # 295), and oral argument on the legal issues involved was heard in open court on September 13, 2005.  This matter is now ripe for decision.

## BACKGROUND

This motion arises from two wiretap orders obtained by the United States in its investigation of the alleged conspiracy that forms the basis of Count One of the indictment in this case.  A wiretap order for a cell phone owned and/or used by two individuals not named in the present indictment was issued on May 26, 2004 (the "May Wiretap Order").  A wiretap order for a cell phone allegedly owned by Defendant Rice was issued on June 23, 2004 (the "June Wiretap Order").  The Defendants seek to suppress evidence obtained as a result of those

1

wiretapped conversations; specifically, the United States alleges that each of the Defendants was overheard and recorded during the taping pursuant to the June Wiretap Order, connecting them to the conspiracy.  The Defendants argue that suppression of that information is warranted because (i) the United States failed to minimize the interceptions as required by statute; (ii) the affidavit supporting the June Wiretap Order does not demonstrate sufficient probable cause; (iii) the extension of the June Wiretap Order was invalid because the June Wiretap Order was improvidently granted or because the extension application's supporting affidavit is insufficient; (iv) the United States failed to meet the requirement of attempting to employ normal investigative techniques; and (v) the recorded conversations were not sealed within the required time period.

In an opinion issued on September 9, 2005 (Dkt. # 300), the Court held that the optical disc containing the recorded conversations was sealed within the time period required by the statute.  Therefore, for purposes of this opinion, only four grounds for suppression remain. Three of these (probable cause, necessity, and validity of the extension order) are related in that they deal primarily with the government's conduct in obtaining the various wiretap orders; therefore, the Court will address the minimization argument first and then proceed to the other three.

## DISCUSSION

### *Sufficiency of Minimization Employed*

The first possible basis for suppression, then, is that the United States failed to satisfy the requirements of 18 U.S.C. 2518(5), which provides, in relevant part:

> Every order and extension [of a wiretap order authorized under this section] shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon attainment

2

of the authorized objective, or in any event in thirty days. In the event the intercepted communication is in a code or foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception. An interception under this chapter may be conducted in whole or in part by Government personnel, or by an individual operating under a contract with the Government, acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception.

In compliance with this provision, each of the wiretap orders in question here contained a provision requiring that "all monitoring of wire communications ... be conducted in such a way as to minimize the interception of communications not otherwise subject to interception [under the statute]."  In the context of the minimization requirement for wiretap surveillance, the Supreme Court has held that the ordinary Fourth Amendment standard - objective reasonableness - governs the agents' conduct.  *Scott v. United States*, 436 U.S. 128, 137, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978).

Defendants argue that (1) "review of the optical disc recordings reveals that the intercepted conversations were not reasonably minimized ... [in that they] involve mere gossip or information about ... things having nothing whatsoever to do with the sale or distribution of drugs" (Defendants' Post-Hearing Brief, Dkt. # 281, at 49-50) and (2) that, based upon the statistics provided by the United States, there was a significant amount of "unexplained non-minimization" and other calls not minimized.  They argue on these bases that the government's minimization procedures were not objectively reasonable.

As an initial matter, the Court notes that "in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression."  *U.S. v. Feldman*, 606 F.2d 673, 679 n. 11 (6th Cir. 1979).  In order to do so in the minimization context, Defendants must "display that the monitoring agents exhibited a

3

high disregard for [their] privacy rights or that they did not do all they reasonably could to avoid unnecessary intrusions." *Id.* at 679.  Further, as the court in *Scott* noted, "[18 U.S.C. 2518(5)] does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations.  Whether the agents have in fact conducted the wiretap in such a manner will depend upon the facts and circumstances of each case." 436 U.S. at 140.

The *Scott* court began its analysis of the objective reasonableness of the agents' conduct by describing factors relevant to the analysis.  It noted that, although statistical breakdowns may sometimes be helpful, "...there are surely cases ... where the percentage of nonpertinent calls is relatively high and yet their interception was reasonable." *Id.*  One of the court's examples of a possible situation fitting this description is relevant here: "... when the investigation is focusing on what is thought to be a widespread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise.  And it is possible that many more of the conversations will be permissibly interceptible because they will involve one or more of the co-conspirators." *Id.*  In light of the Supreme Court's observations in *Scott*, the Court believes that, on the whole, the agents' minimization efforts were objectively reasonable.  Although a significant number of calls were intercepted, the statistics are not so overwhelming as to suggest a high disregard for the Defendants' privacy rights or that the officers did not do all they reasonably could to protect the privacy rights of those involved.  The Defendants have not demonstrated sufficient defects in the minimization to warrant suppression.

### Probable Cause

Defendants also challenge the wiretap orders on the grounds that the applications failed

to establish probable cause as required by 18 U.S.C. 2518(3)(a), (b), and (d).[1]  Those provisions

allow the issuing judge to enter the order authorizing the wiretap if:

> (a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;
> (b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception; [...]
> (d) except as provided in subsection (11), there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

The parties agree that the probable cause standard in the wiretap context is the same standard as

is used in the search warrant context, set forth in the seminal Supreme Court case *Illinois v.*

*Gates*.  462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).  *See, e.g., United States v. Smith*,

783 F.2d 648, 650-51 (6th Cir. 1986).  Defendants argue that the information contained in the

affidavit supporting the wiretap application in question was either insufficient as a matter of law

or too stale to establish probable cause.  The Court will address each separately, but before

proceeding to that analysis the Court will briefly outline the contents of the sections of the

challenged affidavits which relate to probable cause.

The affidavit of Agent Scott Wenther ("Wenther Affidavit") was filed in support of the

application for wiretap authorization on the cellular telephone then-currently assigned number

502-634-6374 ("Primary Rice Phone").  The Wenther Affidavit states that it supports an

application seeking information involving six offenses or types of offenses: (a) distribution and

possession of controlled substances in violation of 21 U.S.C. § 841(a)(1); (b) use of a

---

[1]Subsection (c) of this section deals with the issue of "normal investigative procedures," and Defendants' challenge to that subsection is addressed separately in this opinion.

communications facility in commission of controlled substances offenses in violation of 21

U.S.C. §§ 846 and 963; (c) attempts and conspiracies to commit the above crimes; (d) possession

of a firearm in relation to those crimes in violation of 21 U.S.C. § 924(c); (e) money laundering

and conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956 and 1957; and (f)

aiding and abetting the aforementioned crimes, in violation of 18 U.S.C. § 2.  (Affidavit, Exhibit

to Dkt. # 218, at 2-3). These offenses are contained in 21 U.S.C. § 2516 as required by

subsection (a) of § 2518 (quoted above).  The Wenther Affidavit also avers that the facts

contained in the affidavit support the assertion that there is probable cause to believe that the

Primary Rice Phone "is being used regularly by Reginald Rice in discussing narcotics

transactions" as subsection (b) of § 2518 requires.  Finally, the Wenther Affidavit states that the

Primary Rice Phone "is subscribed to Reginald Rice at 2516 W. Kentucky Street Louisville,

Kentucky," as subsection (d) of § 2518 requires.  *Id.* at 3-4.

In support of these assertions of probable cause, the Wenther Affidavit contains, in

relevant part, the following assertions of fact. (1) A confidential source ("CS") stated that Rice

and Shawn Bullitt (whom the CS was recruited to investigate) "are associated with each other

and involved in the trafficking of multi-kilogram quantities of cocaine.  Rice has a well-known

reputation as being a violent, large-scale cocaine distributor who has successfully intimidated

individuals through violence and/or the threat of violence." *Id.* at 7.  (2) The "CS stated that a

black male known to CS by the moniker of 'Tweety' receives kilogram quantities of cocaine

from Reginald Rice and Benjamin Hernandez." *Id.* at 7-8.  (3) Rice "has had prior drug and

robbery arrests and convictions on narcotics charges, dating from 1992 to the most recent in

2003.  Reggie Rice has been listed as a subject in numerous local, state, and federal

6

investigations in the late 1990s to the present.  In 1997, Rice was convicted of Possession of a

Controlled Substance (Cocaine) and received a sentence of one year imprisonment."  *Id.* at 9.

(4) Pursuant to the May Wiretap Order:

> On 06/13/2004, a telephone call between Shawn Bullitt ... and Reggie Rice, utilizing the [Primary Rice Phone], was monitored and recorded.  In this conversation, Bullitt spoke of meeting an unidentified black male (referred to only as Mia's husband from Atlanta) in Louisville.  Bullitt summarized the conversation as follows "...the [*****] got to talking like ... a hundred.  I'm like, [****], I kept it real.  I mean, any how, I ain't even in that league."  Rice responded, "I gotta look..."  Bullitt stated that he did not even know if it was here or not.  Bullitt reported to Rice that Michael Derrick Hunter, a.k.a. "Tweety Bird," told Bullitt, "It's in progress."  Bullitt told Rice, "It's just talk ... I ain't got a piece of it.  It's just strong talk..."  Later in the conversation, Rice stated that he took a little bit of what he referred to in coded language as "compress on."  Training and experience of your affiant indicates that coded language is often used in discussing trafficking and distribution of controlled substances.  Cocaine is compressed and wrapped in kilogram packages for shipment.  Rice stated that he is currently trying to get rid of it.  Rice then states, "Boy...but I got to look!" (in reference to their earlier conversation regarding the "hundred" that is still in progress).  Bullitt informed Rice that he would "go out here and if I see some, I'm going to call you."

*Id.* at 22-23.  (5) As to this conversation, the affidavit also states that toll analysis (i.e., a "pen

register") of the Primary Rice Phone revealed that:

> [d]uring the period 05/03/2004 through 06/13/2004, the Primary Rice Phone called or was called a total of 38 times by (502)817-0594. [That number] was subscribed to by Michael Hunter ... and known to be used by Shawn Bullitt. [Pursuant to the May Wiretap Order], [a] telephone conversation regarding the trafficking and/or distribution of controlled substances was intercepted ... [a]nalysis of the coded language of this intercepted telephone call indicated that Bullitt and Rice spoke of a shipment in progress of "a hundred."  In the above-captioned conversation, Rice mentioned previously obtaining what he referred to as "compressed on" and that he was "getting ready to get rid of it."  Information received from sources also indicates Rice to be involved in the trafficking of multi-kilogram quantities of cocaine.  The coded language is therefore interpreted to mean that Rice was interested in obtaining an unspecified quantity of a hundred kilogram shipment of cocaine.

*Id.* at 24.  (6) The affidavit further states that the pen register of the Primary Rice Phone revealed

141 calls to or from one of two phones identified as being subscribed to by a Fidel Gray, who

7

was "believed to be somehow related" to Terrell Gray; as to Terrell Gray, "[i]nformation received from sources indicates Terrell Gray ... and [Rice] associate with each other and are involved in the trafficking of multi-kilogram quantities of cocaine."*Id.* at 26. (7) The affidavit appears to allege that the conversations intercepted pursuant to the May Wiretap Order included at least one other conversation between Bullitt and Rice in which the two discussed "pertinent" topics; however, it does not detail any conversation other than the one already described above. *Id.* at 38.

*Sufficiency of the Information*

Defendants attack the sufficiency of the information supporting probable cause in the affidavit on three grounds: (a) it is a "bare bones" affidavit in that the CS did not have any direct knowledge of criminal activity by Rice, but instead reported essentially rumors; (b) the agent's failure to describe the other conversations discussed in point (7) above render the affidavit not a "full and complete statement of the facts and circumstances" as required by the statute; and (c) the conversation that is recounted is not sufficient to establish probable cause because Agent Wenther's translation is either incorrect or, if correct, does not indicate sufficient (indeed, any) criminal activity on the part of Rice.

As an initial matter, Defendants assert that the affidavit is "bare bones" in that the government apparently used the affidavit prepared to support its application for the May Wiretap Order (dealing with a phone used by Shawn Bullitt) as a "template" for the Wenther Affidavit. They allege that this is the equivalent of the affidavit disapproved of in *United States v. Weaver*, 99 F.3d 1372 (6th Cir. 1996).  In *Weaver*, the Sixth Circuit in applying the *Illinois v. Gates* "totality of the circumstances" test, said:

> ...we recognize that two factors are critical to determining whether an affidavit based on a confidential informant's tip provides a "substantial basis" for finding probable cause: (1) an "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles [the informant's tip] to greater weight than might otherwise be the case"; and, (2) corroboration of the tip through the officer's independent investigative work is significant.

*Id.* at 1377 (quoting *United States v. Sonagere*, 30 F.3d 51 (6th Cir. 1994)).  The use of the earlier affidavit as a "template" is not in and of itself a problem; the investigation of Bullitt appears to have been connected to the investigation of Rice, and since one of the allegations is that the two were associated with each other, it makes sense that some of the facts would be common to the two affidavits and that a starting point for constructing an affidavit supporting a request for a wiretap on Rice could be the affidavit supporting the wiretap on Bullitt.  The two factors mentioned by the *Weaver* court must still be considered in determining the value of the CS information to the probable cause analysis.  Some parts of the information provided by the CS as described in the affidavit (numbered 1 and 2 in the Court's summary above) do bring something substantial to the probable cause analysis under the *Weaver* test.  For example, the assertion that Rice and Bullitt are associated with each other *vis a vis* their involvement in the drug trade was, apparently, explicit (though not asserted to have been known first hand) and is corroborated by the conversation between Rice and Bullitt recorded under the May Wiretap Order.  If the CS information formed the entire basis for the affidavit, it would likely fall short under *Weaver*.  Much of the information reported by the CS appears to be rumor, or at least not supported by details or an assertion of personal knowledge.  However, under the "totality of the circumstances" test, the Court must also take into account the other information contained in the affidavit.  In light of the fact that there is other significant evidence, the affidavit is not "bare bones."

Defendants further argue that the fact that Agent Wenther makes reference to conversations not described in the affidavit causes the affidavit to run afoul of the statutory requirement that the affidavit contain "a full and complete statement of the facts and circumstances" that establish probable cause. 18 U.S.C. § 2518(1)(b). It would be unreasonable to require every fact and circumstance related to the investigation to be set forth in the affidavit. If the government was resting its probable cause argument on the existence of the other conversations, it would make sense to say that 2518(1)(b) came into play because the affidavit provides no facts about any such conversations other than the bare assertion that they occurred. However, the other conversations are not necessary to establish probable cause, because the conversation that is reported in the affidavit does.

The major piece of evidence supporting the affidavit's probable cause is the conversation between Bullitt and Rice recorded pursuant to the May Wiretap Order. Defendants attack this portion of the affidavit on two grounds. First, they argue that the explanation offered by Agent Wenther of the "code" used in the conversation is suspect. They base the assertion that Agent Wenther was not able to decode the conversation on his testimony (in the minimization context) at the suppression hearing of June 20, 2005 that it was often difficult to decode the conversations heard on the wire because the code language used was constantly changing. As an initial matter, to say that something is difficult is not to say that it is impossible. Additionally, the on-the-fly nature of the minimization process would logically exacerbate the difficulty of decoding; with additional time to reflect and consider conversations in context, it makes sense that Agent Wenther would be able to decode a conversation which he may or may not have been able to decode at the moment it was taking place. Also, the Court notes that the wiretap was only

10

sometimes monitored by Agent Wenther, so the amount of minimization cannot necessarily be directly related to the ability of one agent to decode.  In any case, an independent interpretation of the language leads the Court to the same conclusion reached by Agent Wenther: Bullitt was telling Rice about a large cocaine shipment, and Rice was expressing a desire and a plan to see it, obviously with an eye toward purchasing it.

It is this conclusion that the Defendants attack in their second complaint about the taped conversation; they argue that, even with Agent Wenther's decoding of the conversation, "Bullitt and Rice are merely gossiping about *unidentified other persons* selling or distributing drugs." (Defendants' Post-Hearing Brief, Dkt. # 281, at 43) (emphasis in original).  The Court's reading of the conversation, however, is quite different.  Although Bullitt says that the amount of drugs he saw was essentially out of his league, Rice says several times that he wants to look; it is possible that he was simply expressing curiosity about such a large shipment, but to think that someone who is, as Defendants concede, a well-known drug dealer, meant only that strains credibility.  Further, Bullitt goes on to say that he would report back to Rice if he came across anything he thought Rice would be interested in.  This language, although somewhat vague, is hardly even "coded" in any significant sense.  Even the portion that is coded (Rice's statements about the compressed cocaine) is easily decipherable; it is a basic fact in drug trafficking that cocaine is often compressed to be sold in large quantities.  It is also a basic fact that someone who possesses such quantities of a drug as potent as cocaine is almost always planning to sell at least some of it.  It is also a basic fact that quality control is often an issue, and that an experienced drug dealer will often insist on seeing drugs before buying them in order to ensure that they are of the quality he or she seeks.

11

As to the statutory requirements for probable cause taking into account the totality of the circumstances, the Court believes that the affidavit establishes probable cause.  In light of what the agents knew about Bullitt, their interpretation of the conversation between Bullitt and Rice is perfectly reasonable; in fact, it is probably the only reasonable interpretation.  That conversation indicates that Rice had committed, was committing, and was planning to commit drug trafficking crimes.  In combination with the other facts known to Agent Wenther, the Court finds that the affidavit was sufficient to establish probable cause.  The Court also notes that "[s]ince the issuing judge is in the best position to determine all of the circumstances in the light in which they may appear at the time, 'great deference' is normally paid to the determination of an issuing judge." *United States v. Alfano*, 838 F.2d 158, 162 (6th Cir. 1988) (rehearing and rehearing en banc denied March 24, 1988).

*Staleness of the information*

Defendants also argue that the information contained in the affidavit was too stale to support probable cause.  Defendants note that, according to the affidavit, the information from the CS was provided in October, 2003 - approximately nine months before the affidavit was filed.  The long-standing rule for evaluating staleness dictates that there is no set time after which information becomes too stale to support an affidavit; rather the information's usefulness "must be determined by the circumstances of each case." *Sgro v. United States*, 287 U.S. 206, 211, 53 S.Ct. 138, 77 L.Ed. 260 (1932).  As the Sixth Circuit more recently said:

> ...the question of staleness depends on the "inherent nature of the crime." Instead of measuring staleness solely by counting the days on a calendar, courts must also concern themselves with the following variables: the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), the place to be searched (mere criminal forum of convenience or secure operational base?),

12

etc.

*United States v. Spikes*, 158 F.3d 913 (6th Cir. 1998) (internal quotation marks and citations omitted). In light of the nature of the information provided by the CS (essentially, that Bullitt and Rice were associated in the drug trafficking business and that Rice had a reputation as a drug dealer, which was apparently general knowledge among Louisville-area law enforcement who worked in the narcotics area), nine months does not seem likely to have rendered that information unreliable. Therefore, the age of the information used does not reduce the "fair probability that ... evidence of a crime" would be obtained via the wiretap. *Illinois v. Gates*, 462 U.S. at 238.

### *Validity of the Extension Order*

Defendants also seek to suppress, on separate grounds, evidence gained as a result of the extension of the June Wiretap Order (granted on July 21, 2004).[2] They argue that "...no probable cause existed to support an extension of the [June Wiretap Order] where the July 21, 2004 Affidavit fails to demonstrate that continued monitoring of [the Primary Rice Phone] would uncover any additional illegal activity or advance any investigative goals." (Defendants' Post-Hearing Brief, Dkt. # 281, at 48). Defendants cite portions of the July 21, 2004 affidavit of Agent Brian Bester ("Bester Affidavit") in which Bester states that: "...intercepted phone calls from [the Primary Rice Phone] ... have revealed a pattern where Rice is often circumspect on [the Primary Rice Phone] and directs potential drug buyers and sources of supply to another phone for drug-related conversations." (Bester Affidavit at 20). Essentially, Defendants suggest

---

[2]Defendants' argument that a defect in the June Wiretap Order itself means that the Extension is also defective will be addressed in the next section.

that this information, while it could be used to support an application for a wiretap of the other

phone, does not support the continued interception of conversations on the Primary Rice Phone.

The Court does not agree.  Even if the substantive drug-related conversations (containing details

about various deals) were taking place on a different phone, the scenario described by the

Defendants in which Rice directs certain callers to a different phone nevertheless provides

information valuable to the investigation - information about the identities of Rice's associates.

The extension of the June Wiretap Order, then, is not invalid independent of the June Wiretap

Order itself.

### *Other Investigative Procedures*

Finally, Defendants argue that the evidence from the wiretap should be suppressed

because the United States failed to satisfy the requirements of 18 U.S.C. 2518(1)(c), which

requires that an application for a wiretap order contain "a full and complete statement as to

whether or not other investigative procedures have been tried and failed or why they reasonably

appear to be unlikely to succeed if tried or to be too dangerous."  The Supreme Court, in

describing the statute, noted:

> Congress legislated in considerable detail in providing for applications and orders
> authorizing wiretapping and evinced the clear intent to make doubly sure that the
> statutory authority be used with restraint and only where the circumstances warrant the
> surreptitious interception of wire and oral communications. These procedures were not to
> be routinely employed as the initial step in criminal investigation. Rather, the applicant
> must state and the court must find that normal investigative procedures have been tried
> and failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.

*United States v. Giordano*, 416 U.S. 505, 515, 94 S.Ct. 1820, 1826-27, 40 L.Ed.2d 341 (1974).

The court in that case also said "we think Congress intended to require suppression where there

is failure to satisfy any of those statutory requirements that directly and substantially implement

the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *Id.* at 527.  Therefore, if the government failed to satisfy the requirements of § 2518(1)(c), suppression is the appropriate remedy.

The Court must determine, then, whether the affidavit in question satisfied the requirements set forth in § 2518(1)(c).  One of the earliest cases in the Sixth Circuit interpreting these requirements is *United States v. Landmesser*, 553 F.2d 17 (6th Cir. 1977).  In that case, the court said:

> While the prior experience of investigative officers is indeed relevant in determining whether other investigative procedures are unlikely to succeed if tried, a purely conclusory affidavit unrelated to the instant case and not showing any factual relations to the circumstances at hand would be, in our view, an inadequate compliance with the statute. ...  What is required in addition, however, is information about particular facts of the case at hand which would indicate that wiretaps are not being "routinely employed as the initial step in criminal investigation." *Giordano*, supra, 416 U.S. at 515, 94 S.Ct. at 1827. See also, *United States v. Vento*, 533 F.2d 838, 850 n. 19 (3rd Cir. 1976).

*Id.* at 20.  Ultimately, the court in *Landmesser* found that, when read in conjunction with the rest of the affidavit and the application which "provided the magistrate with a detailed outline of the activities which led to the application," the conclusory statements about necessity were "fully adequate" because they gave the issuing judge "ample opportunity to understand just what witnesses were involved, which ones were confidential informers, what they knew and what they did not know, and what their relationship to the case and to the defendants was." *Id.* at 20-21.

In another important case interpreting § 2518(1)(c), the Sixth Circuit has said:

> These provisions do not require that the police officials exhaust every conceivable non-wiretap investigative technique.  All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate.

15

*United States v. Lambert*, 771 F.2d 83, 91 (6th Cir. 1985).  In that case, the court found that the affidavit did satisfy the requirements of § 2518(1)(c) because it

> ...explained in great detail that other investigative measures could not reasonably be used because of Lambert's extreme (and correct) suspicion that his activities were being monitored and the fact that alternative investigative procedures, such as directly questioning Lambert and his associates, would likely alert the subjects to the presence and scope of the investigation.

*Id.*  A few years later, the Sixth Circuit reversed a suppression that was based on what the trial judge deemed an inadequate "needs statement" where it found that the government:

> indicated the steps that had been taken with regard to other investigative targets, and the difficulties in placing an informant in or maintaining continual surveillance of those involved in far-flung operations, including involvement of a number of members of a close-knit family group.  The government thus indicated both the "serious consideration" of other measures and the "reasons" for the belief in their inadequacy.

*Alfano*, 838 F.2d at 164.  In that case, the conspiracy involved four "key players" who lived in Michigan, Illinois, New York and Sicily, Italy, and each of whom was related to at least one other member of the conspiracy by blood or marriage.  *Id.* at 160.

The Wenther Affidavit does not satisfy the requirements of § 2518(1)(c).  It indicates neither "serious consideration" of other investigative techniques nor the reasons for Agent Wenther's belief in the inadequacy of the other measures *as used against Mr. Rice*.[3]  The

---

[3]The Court also notes decisions cited by Defendants from the District of Columbia and Ninth Circuits discussing in detail this requirement.  *United States v. Robinson*, 698 F.2d 448, 453 (D.C. Cir. 1983) (upholding a denial of a motion to suppress, but noting in the necessity discussion that "[courts] must be careful not to permit the government merely to characterize a case as a 'drug conspiracy' ... that is therefore inherently difficult to investigate.  The affidavit must show with specificity why in *this particular investigation* ordinary means of investigation will fail.")  *See also United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir. 1985).  Relatedly, in conspiracy cases, "...suspicion that a person is a member of a conspiracy ... is not a sufficient reason to obtain a wiretap."  *United States v. Carneiro*, 861 F.2d 1171, 1181 (9th Cir. 1988).  Although these decisions are not binding precedent, it does not appear that the Sixth Circuit has confronted the specificity issue with an affidavit such as the one in question in this case, and the

Affidavit indicates that, as to Mr. Rice, the government *was* using the wiretap as the initial step in its investigation of him - directly contrary to the Supreme Court's mandate in *Giordano*. Their decision to do so was, from the investigators' perspective, understandable - they heard Mr. Rice conversing with Mr. Bullitt, had reason to believe that he used that cellular phone in drug transactions, and quite logically decided that a wiretap of that phone would be the most effective way to obtain information about Mr. Rice's illegal activities.  However, it is in precisely this situation that Congress has intervened to balance the rights of citizens suspected of criminal activity against the legitimate desire of law enforcement to use the full range of tools available to it in order to protect the public from such activity.  Essentially, 2518(1)(c) draws that balance by limiting situations in which the government may use wiretapping by requiring that it not do so as a first resort.  However, the statute does not *require* that the government actually use other investigative measures before it may obtain a wiretap; it does, however, require that the government demonstrate to an issuing judge the reasons that such measures, if used, have been insufficient or, if not used, would be ineffective or too dangerous.  The evidence indicates that it is the latter option which must be evaluated in this case - no non-electronic investigative steps were actually taken, so the Wenther Affidavit must demonstrate to the issuing judge the reasons that the other techniques would be ineffective or too dangerous.  In so doing, it is not sufficient simply to speak in generalities about the difficulties law enforcement face in using such techniques in the *type* of case in question; rather, the affidavit must provide information about the specific case in question and provide the issuing judge information about the usefulness or dangerousness of the techniques in relation thereto.

---

Court finds their reasoning persuasive.

17

The reason such a requirement inheres in § 2518(1)(c) has to do with the function of the application process in general.  Given the intrusiveness of the wiretap technique, the requirement of pre-approval by a judge serves to protect the public from improper use of government's coercive power; in this regard, it is similar to a warrant procedure (and, indeed, the probable cause requirement is the same found in search warrant procedures, as discussed *supra*).  In order to allow the judge to exercise this function (as § 2518(1)(c) contemplates when it requires that the issuing judge find necessity and as it requires in § 2518(3)(c)) in a meaningful way, the judge must have more information than mere generalities; otherwise, his or her review is no more than a rubber stamp.  Further, as discussed in the probable cause context in *Franks v. Delaware*, meaningful review requires that a defendant be allowed to attack the basis upon which such determinations are made in the event that misleading information is provided to the judge.  438 U.S. 154, 165-71, 98 S.Ct. 2674, 2681-84, 57 L.Ed.2d 667 (1978).  Therefore, if the Wenther Affidavit is to support the application, it must give the issuing judge specific information on the basis of which the judge can evaluate Agent Wenther's assertions regarding the efficacy and dangerousness of the other techniques.  An affidavit as generalized as the one submitted by Agent Wenther cannot do so.

Again, a detailed description of the statements contained in the affidavit supporting the application for the wiretap order will be useful.  The Wenther Affidavit contains approximately six pages of statements under the heading "Alternative Investigative Procedures."  In sum, they are as follows:

> All normal avenues of investigation have been carefully evaluated for use or have been attempted with minimal results.  The traditional investigative techniques utilized thus far have included the use of confidential sources (against known members of the Shawn Bullitt organization), obtaining toll records for other phone lines and for the [Primary

Rice Phone], and physical surveillance.  Also closely considered, but not deemed likely to succeed for reasons set forth below, include the use of undercover agents, use of a Federal Grand Jury, the serving of search warrants, interviews of subjects or associates, and the use of "trash pulls."

Wenther Affidavit, at 18-19.  The affidavit then goes on to discuss the various procedures mentioned in the paragraph above in somewhat more detail.  It first addresses the techniques allegedly utilized to that point in the investigation (confidential sources, toll records, and physical surveillance), and then it discusses other techniques which were allegedly considered and rejected for various reasons (grand jury subpoenas, search warrants, trash pulls).  As to confidential sources, Agent Wenther says:

It appears from the information received from the CS, as well as my own experience, that *Reginald Rice is unlikely to discuss the full extent of his organization's activities or membership*.  The *CS utilized in the investigation of the Shawn Bullitt organization was unable to meet directly with others associated with Bullitt, including Reginald Rice*.  In my experience, it is unlikely that the CS will be able to conduct drug transactions directly with all identified members of this organization.  Even if this did occur, these members would be unlikely to reveal their current source(s) of supply for the cocaine, the precise smuggling routes used by the individuals responsible for transporting the cocaine to Kentucky, identity of the couriers, the identities of the ultimate purchasers of the narcotics, the locations where the drugs and drug proceeds are stored or the precise manner in which he launders his drug proceeds.  This type of information, which the United States is seeking in this investigation, is guarded and is only supplied to people with a need to know, in order to protect the shipments of cocaine and drug proceeds from seizure by the authorities, from theft by other drug traffickers, and to guarantee that Rice's position of power in the organization will not be supplanted by a competitor.  As a result, CS has not been made aware of the organization's entire membership and activities.  With the limited information developed to date by sources, and without evidence obtained from court authorized intercepts, the objectives of this investigation cannot be more fully developed.  As referenced previously, *CS has not been able to purchase controlled substances from Reginald Rice.  The CS is not closely associated with Reginald Rice and is therefore not in a position to attempt the purchase of controlled substances.  No other confidential source has been identified in this investigation that would be in a position to attempt the purchase of controlled substances from Reginald Rice.  CS has stated that he/she has limited ability to introduce unfamiliar individuals to Rice or his co-conspirators*.  Additionally, based on my knowledge and experience in investigating drug trafficking organizations, I have learned that these organizations go to great lengths to compartmentalize their operations.  This is done in an

19

> effort to construct as many layers of insulation as possible between each component of
> the organization thus preventing the penetration of the organization and threatening its
> operational integrity.  The use of the undercover agents is not expected to obtain the
> evidence necessary to charge all of the participants included in this conspiracy.  The
> undercover agents will not likely be exposed to all subjects of this investigation in order
> to effectively and sufficiently obtain admissible evidence needed to prosecute the
> offenses under investigation.

Wenther Affidavit, at 19-20 (emphasis supplied).  The only information in this section pertaining

specifically to Mr. Rice, then, is that the CS used in the government's investigation of Mr. Bullitt

was not in a position to be a source of information about Mr. Rice, and that "no other

confidential source has been identified" that would be in such a position.  There is no indication

that the government took any steps to develop such a source, nor is there any information about

Mr. Rice's "organization"[4] specifically that suggests that to do so *in this case* would be unlikely

to succeed or dangerous; there is only generic language about how drug trafficking organizations

generally operate.  As to the pen register and telephone toll analysis, the affidavit says:

> Although a pen register and trap and trace has been obtained and used, this has not
> achieved all of the goals of the investigation.  These records provide only circumstantial
> evidence that the telephone to be monitored was used to make or receive calls to and
> from other telephones.  These records do not identify those individuals actually making
> and receiving telephonic communications to or from the target telephone as does the
> interception of wire communications.  Nor do these records provide the content of the
> calls occurring on the target telephone.  As demonstrated in previous paragraphs, the
> *pattern of telephone use by Rice shows repeated calls to telephone numbers subscribed to
> by known individuals with histories of drug-related arrests*.  While this information is
> useful, *it does not indicate current criminal involvement (if any) or even definitively
> establish the existence of criminal conspiracy*.  Indeed, I believe that only through the
> interception of wire communications can the full scope of this conspiracy be discovered,
> and direct evidence for successful prosecution of all the subjects and assets involved be
> obtained.

Wenther Affidavit, at 22 (emphasis supplied).  Again, the affidavit contains a significant amount

---

[4]In fact, there are no assertions that would enable the issuing judge to learn what kind of
"organization" the investigators believed existed - its size, structure, location, etc.

of general language about the usefulness of pen registers in general.  As to Mr. Rice specifically,

it says only that within the limitations of the technology, the pen register has been as useful as it

possibly can be - linking Mr. Rice with other individuals with known drug histories.  Finally, as

to physical surveillance, the affidavit says:

> *Physical investigation of the subjects of this investigation has been conducted and is presently being conducted with only limited success.  Physical surveillance has identified locations and vehicles utilized by members of this organization.  Physical surveillance has also corroborated information provided by the CS.*  Physical surveillance has shown [*sic*] to have its limitations.  The source(s) of cocaine supply outside Kentucky and other Kentucky-based distributors of this organization have not been identified thus limiting the number of targets who could be the subject of surveillance.  The law enforcement agents who have investigated this organization are not in a position to learn the names, addresses, telephone numbers and other identifying information of cocaine distributors outside those already detailed above.  As a result, law enforcement is severely limited in its ability to identify the additional key members of this organization, including but not limited to the transporters, suppliers, and other distributors.  Moreover, surveillance in and of itself, even if highly successful, rarely succeeds in gathering sufficient evidence of the criminal activities under investigation.  Surveillance is an investigative technique that is used to confirm meetings between alleged conspirators, but agents watching meetings cannot determine the purpose of the meeting or hear what the targets discuss.  When used in connection with electronic surveillance, physical surveillance takes on new significance if the activities observed relate to intercepted conversations.  For example, if a conversation about an upcoming narcotics transaction is intercepted, physical surveillance can be planned to observe the transaction.  *The risk of conducting long-term physical surveillance in this investigation is two-fold.  As previously outlined, this organization utilizes violence and/or the threat of violence as intimidation to further their drug trafficking activities.  Members of this criminal organization with known violent histories routinely carry firearms and wear bullet-resistant vests, which poses an unreasonable danger to law enforcement personnel attempting to conduct physical surveillance.*  Additionally, based on my knowledge and experience in investigating drug trafficking organizations, I have learned that these organizations employ counter-surveillance to detect law enforcement operations.  Such detection would severely hamper investigative efforts.  Based on my knowledge and experience in investigating drug trafficking organizations, I have learned that members of these criminal organizations often utilize vehicles, telephones, and other property licensed out of and registered to others in an attempt to insulate themselves from the criminal activities they are involved in.  Even if highly successful, tracking the movements of suspected drug traffickers alone will not establish their involvement in criminal activity.

Wenther Affidavit at 20-22 (emphasis supplied).  An issuing judge would glean several things

from this section of the affidavit.  One, that Mr. Rice had been the subject of physical

surveillance by agents involved in this investigation; and two, that vehicles and locations used or

owned by Mr. Rice and/or his associates were the subject of physical surveillance.  Also, the

judge would learn that Agent Wenther had information which led him to believe that Mr. Rice

and/or his associates had used violence or threats of violence, had violent histories, carried

firearms, and wore bullet-proof vests.

Agent Wenther's affidavit then goes on to discuss the possibility of using a grand jury

subpoena or interview in order to obtain information about Mr. Rice's alleged drug trafficking

activities.  The paragraph mentions consultation with Mr. Chance, the supervising Assistant

United States Attorney, and goes on to discuss in general terms the reasons why a grand jury

investigation would fail to "expos[e] the full nature and scope of the criminal activity, or the

identities of all the participants."  Wenther Affidavit at 23.  It notes that the issuance of

subpoenas or interviews would alert target subjects to the fact of the investigation; that subjects

of the investigation would likely invoke their Fifth Amendment right to avoid self-incrimination;

that granting immunity to target subjects would foreclose prosecution; that physical evidence

would be destroyed or hidden if the target subjects knew about the investigation; and that

"narcotics traffickers" have a "potential for violence" that deters potential witnesses from giving

truthful testimony.  *Id.*

Next, the affidavit discusses the possibility of using search warrants and interviews,

asserting that their use is premature.  It states: "[e]ven though locations have been identified

through the course of the investigation, probable cause sufficient to obtain a search warrant for

any particular location owned or controlled by Reginald Rice has not been established."

Wenther Affidavit, at 23.  Agent Wenther further states that even if probable cause did exist, the government would not have obtained a search warrant because doing so would alert the subjects to the fact of the investigation.  *Id.*  Finally, as to analysis of discarded trash, the affidavit says that this technique "was considered but not attempted."  Wenther Affidavit at 24.  The reason for this decision was that "intelligence and evidence gained from trash pulls has been limited" and was therefore "deemed ineffective to sufficiently obtain admissible evidence needed ... when weighed against the potential risk of discovery in conducting these covert techniques."  *Id.*

In summary, the affidavit contains the following specific information about the use of non-wiretap techniques in the investigation of Mr. Rice: the CS used in the investigation of Mr. Bullitt is not able to make contact with Mr. Rice and would therefore not be of use; pen registers revealed possible connections to other people with histories of drug-related arrests; and physical surveillance was used but was of limited usefulness and would be dangerous.  The assertions about physical surveillance are the most troubling because they are, simply put, misleading. They give the issuing judge the impression that surveillance was performed on Mr. Rice; Agent Wenther's testimony at the hearing, however, was that Mr. Rice himself was never under surveillance.  Transcript, Dkt. # 262, at 287.  The United States attempts to account for the misstatement by explaining that the investigation of Mr. Rice and the investigation of Mr. Bullitt were really one and the same investigation.  However, it cannot be that surveillance of Mr. Bullitt can create necessity for a wiretap on the phone of Mr. Rice.  Further, assertions that there were surveillance of "locations and vehicles utilized by members of the organization" do not equate with physical surveillance of Mr. Rice himself.  The statements in the Wenther Affidavit would cause a reasonable judge reading the affidavit to believe that the agents had performed

surveillance on Mr. Rice to no avail; this is simply not true.  At the hearing of June 20, 2005, Agent Wenther explained that no surveillance was done, and that the reason no surveillance was done was that they did not believe they had current, reliable information about Mr. Rice's whereabouts.  *Id.*  Even if this is true, and the Court has no reason to believe it is not, this does not vitiate the necessity requirement or excuse the misleading language in the Wenther Affidavit. The statements about the dangers of surveillance are equally unavailing.  In the context of the Wenther Affidavit, the bald statement that "[m]embers of this criminal organization ... routinely carry firearms and wear bullet-resistant vests" does not provide sufficient information to the magistrate about Mr. Rice to determine whether physical surveillance was too dangerous to be attempted.  Wenther Affidavit at 21.  This is not to say that there is no possible affidavit in which such a statement might be sufficient.  If, for example, the affidavit also contained information about the associates of Mr. Rice indicating that they operated as an organization, that information could lead to a reasonable conclusion that Mr. Rice also used firearms and bullet-resistant vests, or that surveillance of him was likely to bring law enforcement into contact with people who used them.  However, the mere assertion that Mr. Rice operated in an "organization" is not sufficient to allow a judge to assume that he himself uses such equipment.[5]   The section of the Wenther Affidavit on probable cause, then, does not support a finding of necessity.  Even if deference is due an issuing judge's determination of necessity (as it is to an issuing judge's determination of probable cause), the Wenther Affidavit's misleading characterization of its use of physical surveillance requires that the Court analyze the necessity determination anew.

---

[5]This is also not to say that such information must necessarily be in the same paragraph or section as the discussion of physical surveillance; however, it must at least be within the affidavit or other information possessed by the issuing judge at the time of his or her decision.

The summary paragraph regarding other investigative techniques in the Wenther Affidavit asserts that a CS was one of the techniques used; however, the language of the affidavit when read more closely in the section dealing with the use of confidential informants belies this assertion.  The CS discussed was the CS recruited to provide information on Mr. Bullitt; this person had no information about Mr. Rice other than speculation that he was a source of cocaine for Mr. Bullitt.  As with the physical surveillance, the fact that a CS was used to obtain information about Mr. Bullitt does not mean that the technique was used as to Mr. Rice; in fact, the Wenther Affidavit says that the CS in question was not able to meet with, introduce people to, or conduct controlled purchases from Mr. Rice.  Even overlooking the mistaken statement that this was a technique used to investigate Mr. Rice, the discussion of the ineffectiveness of the use of a CS as to Mr. Rice suffers from serious problems with specificity.  The language providing Agent Wenther's analysis of the effectiveness of the use of confidential informants provides insight only into the fact that confidential informants are often, or even usually, difficult to develop in drug trafficking/conspiracy cases.  Wenther Affidavit at 19-20.  With no information about Mr. Rice's organization, an issuing judge cannot draw an inference that such difficulties necessarily, or even possibly, apply in the case of Mr. Rice.  Indeed, given the extremely short period of time between the call between Mr. Bullitt and Mr. Rice that set in motion the proceedings seeking the wiretap of the Primary Rice Phone and the filing of this application, it appears that very little, if any attempt was made to develop such an informant.[6]

The discussion of the pen register/toll analysis technique noted that this technique is

---

[6]See Agent Wenther's testimony at the June 20, 2005 hearing; Transcript, Dkt. # 262, at 287.

inherently limited in its usefulness. The "pattern of telephone use by [Mr. Rice] ... does not

indicate current criminal involvement (if any) or even definitively establish the existence of a

criminal conspiracy."  Given the limited nature of this evidence, and the highly general

discussion of the information gleaned from it in the affidavit, it cannot stand alone to support an

issuing judge's determination that there was necessity that satisfied the requirements of

2518(1)(c), as required by § 2518(3)(c).

The Wenther Affidavit then goes on to discuss three other investigative techniques which

essentially were not attempted, and purports to explain why such techniques would not work.

Each explanation suffers from the same problem; it discusses typical problems with the

techniques in typical drug cases, but makes no reference to any facts about Mr. Rice specifically

which would make the techniques ineffective or dangerous.  Finally, the Wenther Affidavit

discusses the intercepted conversation between Mr. Rice and Mr. Bullitt, intercepted pursuant to

the May Wiretap Order.  In light of the purposes of the statute, it cannot be that the interception

of a wiretapped conversation on a different telephone constitutes an alternative investigative

technique; it is the same technique, simply applied to someone else.

Because the June Wiretap Order was invalid, the extension thereof granted on July 21,

2004 was also invalid.

From the statements of the lawyers at the evidentiary hearing, it was apparent that Mr.

Rice was a known drug dealer.  Within ten days of the first hint of Mr. Rice's involvement the

government requested a wiretap.  Other than some uncorroborated thoughts and opinions there is

no evidence that any other investigative technique was ever used or even seriously considered.

The government's motives and desires are understandable.  Significant cases such as these are

difficult for all involved with the process.  In the end, despite the consequences, the Court must apply the law as written, in good faith and in its intended manner.

For these reasons, the Court holds that the Wenther Affidavit is insufficient to satisfy the requirements of 2518(1)(c).  It fails the necessity requirements because it lacks the specificity required to enable the issuing judge to perform his review function, and it demonstrates that, contrary to the Supreme Court's decision in *Giordano*, the government used the wiretap as the first step in its investigation of Mr. Rice.  As discussed *supra*, the appropriate remedy for such a failure is suppression.  Therefore, Defendants' Motion to Suppress the fruits of the illegal wiretap will be **GRANTED**.  An appropriate order shall issue.